The HUMANE SOCIETY OF the UNITED STATES, Humane Society International, Defenders of Wildlife, Royal Society for the Prevention of Cruelty to Animals, Whale and Dolphin Conservation Society, and Earth Island Institute, Plaintiffs,

v.

Ron BROWN, Secretary of Commerce, and Warren Christopher, Secretary of State, Defendants.

Slip Op. 95–148.

Court No. 95–05–00631.

United States Court of International Trade.

Aug. 18, 1995.

---

Sierra Club Legal Defense Fund (Patti A. Goldman) for plaintiffs.

Frank W. Hunger, Assistant Attorney General; Lois J. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division (Jeffrey M. Telep) and Environment & Natural Resources Division (James C. Kilbourne, Christiana P. Perry and Mark A. Brown), U.S. Department of Justice; and Office of the Legal Advisor, U.S. Department of State (David Balton) and Office of General Counsel, National Oceanic and Atmospheric Administration (Margaret F. Hayes), of counsel, for defendants.

## OPINION & ORDER

AQUILINO, Judge:

Alleging continuing large-scale driftnet fishing in the Mediterranean Sea by fishermen from Italy in defiance of international, European and American law, the above-named plaintiffs come to this Court of International Trade with a complaint styled as one for declaratory and injunctive relief and accompanied by voluminous papers entitled Motion for a Preliminary Injunction. The defendants oppose that application for immediate relief and have interposed motions of their own, the first to dismiss the complaint and the others for relief from discovery already requested by the plaintiffs.

A hearing was held in open court on August 1, 1995 on the respective motions.

### I

■ For the purposes of a motion to dismiss, the material allegations of a complaint are taken as admitted and are to be liberally construed in favor of the plaintiff(s). *E.g., Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 *reh'g denied,* 396 U.S. 869, 90 S.Ct. 35, 24 L.Ed.2d 123 (1969), and cases cited therein.

### A

With this rule in mind, the complaint herein alleges, among other things, that plaintiff The Humane Society of the United States ("HSUS") is a national membership organization with its principal office in Washington, D.C. and regional offices throughout the country. It

promotes the protection of animals, including marine species and cetaceans, in particular. For more than 23 years, HSUS has actively worked to protect cetaceans, including by seeking to stop destructive fishing practices like large-scale driftnetting, which pose a grave threat to marine mammals, sea turtles, sea birds, and non-target fish species. HSUS brings this action on its own behalf and on behalf of its more than 2 million members and supporters, more than 300 of whom reside in the European Union. HSUS members engage

in and obtain great benefit from watching wildlife, including whales and dolphins and other marine life. HSUS members are harmed by large-scale driftnet fishing because it kills marine mammals, sea turtles, and sea birds and thereby reduces HSUS members' opportunity to view wildlife, particularly depleted and elusive species, such as the sperm whale.

Complaint para. 4. The complaint is possessed of similar representations as to the other named plaintiffs: For example, Humane Society International and its affiliate in Europe "are working to protect cetaceans and other marine life from destructive fishing practices like large-scale driftnetting." *Id.,* para. 5. There are 100,000 Defenders of Wildlife members throughout the United States and the world who "are harmed by large-scale driftnet fishing because it kills marine mammals, sea turtles, and sea birds and thereby reduces ... [their] opportunity to view wildlife." *Id.,* para. 6. The Royal Society for the Prevention of Cruelty to Animals was established in 1824 in the United Kingdom to "prevent or suppress cruelty to animals." Its

22,000 members and 600,000 supporters throughout the European Union (including Italy) and the rest of the world ... enjoy watching marine wildlife including in and around the Mediterranean Sea and throughout the world. RSPCA members are harmed by the diminishing numbers of marine wildlife in and around the Mediterranean Sea as a result of large-scale driftnet fishing in the area because it reduces their opportunity to view such wildlife.

*Id.,* para. 7. Supporters of the Whale and Dolphin Conservation Society, which is also headquartered in England, "are harmed by the diminishing numbers of dolphins and whales in and around the Mediterranean Sea as a result of large-scale driftnet fishing in the area." *Id.,* para. 8. A similar claim is made on behalf of Earth Island Institute and some 30,000 members. *See id.,* para. 9.

The defendants are being sued in their official capacities as U.S. Secretary of Commerce and Secretary of State, respectively. Each is averred to have responsibilities under the High Seas Driftnet Fisheries Enforcement Act, Pub.L. No. 102–582, 106 Stat. 4900 (Nov. 2, 1992).

**B**

That statute describes "large-scale driftnet fishing", in general, as

a method of fishing in which a gillnet composed of a panel or panels of webbing, or a series of such gillnets, with a total length of two and one-half kilometers or more is placed in the water and allowed to drift with the currents and winds for the purpose of entangling fish in the webbing.

16 U.S.C. § 1826c(2)(A). Paragraphs 12–15 and 17 of the complaint add that the panels consist of

non-degradable plastic webbing. Driftnets are sometimes as long as 30 kilometers. Driftnet fishing involves the suspension of driftnets vertically in the water with floats attached to the top of the panel and weights attached to the bottom.

13. Driftnets are placed in the water at night and ... catch virtually all fish, marine mammals, and sea turtles that cross their paths as they drift in the wind and ocean currents.

14. Driftnets are a nonselective type of fishing gear. A high percentage of the fish caught are not the target of the particular driftnet fishery. These non-target fish species are generally discarded at sea, even where the fish are the target of other fisheries. In some fisheries, only a small proportion of the catch is retained for sale.

15. Because the nets are composed primarily of non-degradable plastic, lost or discarded nets or net fragments continue to "ghost-fish," ensnaring fish and marine mammals as they drift aimlessly in the ocean.

\*　　\*　　\*　　\*　　\*　　\*

17. Whales, dolphins, sharks, sea turtles, sea birds, and nontarget fish become entangled in large-scale driftnets both when they are deployed and in use for fishing and when they are lost, abandoned or discarded. Such entanglements cause countless deaths of marine mammals, sea turtles, sea birds, and fish. Slow-reproducing species, such as whales and dol-

phins, are particularly vulnerable to the effects of driftnet fishing.

Similar description is contained in the report to Congress in support of adoption of the Enforcement Act. *See, e.g.,* H.R.Rep. 262, Part 1, 102d Cong., 2d Sess. 4 (Oct. 22, 1992), U.S.C.C.A.N. 1992, p. 4090 ("large-scale driftnets are distinguished by their method of harvest, indiscriminately killing not only non-targeted fish, but dolphins, whales, turtles and seabirds").

The plaintiffs accuse Italians of continuing to engage in such carnage. Their complaint states:

40. The Mediterranean Sea is an enclosed sea. It has no exclusive economic zones, but some areas of varying sizes have been designated as territorial seas. A significant portion of the Mediterranean Sea is considered international waters or the high seas.

41. Italy has a large Mediterranean fleet of more than 600 vessels and 3000 workers fishing for swordfish with driftnets.

42. Throughout the 1990s, reports have documented that the average length of driftnets used by the Italian fleet in the Mediterranean Sea exceeds 2.5 kilometers.

43. The European Commission has reported in 1993 and 1994 that significant numbers of Italian fishing vessels are using driftnets in excess of 2.5 kilometers in length.

44. During the 1990s and as late as 1994, some Italian fishing vessels intercepted by authorities of other European countries have been found with driftnets longer than 2.5 kilometers.

45. Although swordfish are the target of the Italian driftnet fishery, far less than half of the catch is, in fact, swordfish....

## C

The complaint points to resolutions of the United Nations General Assembly adopted on December 22, 1989, No. 44–225, recommending that countries impose a moratorium by June 30, 1992 on the use of large-scale driftnets beyond the exclusive economic zone

of any nation, and on December 20, 1991, No. 46–215, calling for the moratorium to be globally implemented by December 31, 1992, including enclosed and semi-enclosed seas. The plaintiffs also point to a January 27, 1992 regulation of the European Economic Community, No. 345/92, which was adopted to implement the U.N. moratorium and which prohibits vessels from keeping on board or using driftnets exceeding 2.5 kilometers in length.

Prior to adoption of this law by the United Nations and on the part of the European Economic Community, which is now known as the European Union, the U.S. Congress had passed the Driftnet Impact Monitoring, Assessment, and Control Act of 1987, Pub.L. No. 100–220, Title IV, 101 Stat. 1477 (Dec. 29, 1987), which, among other things, sought to "reduce the adverse impacts of driftnets" in the "waters of the North Pacific Ocean, including the Bering Sea"[1] and mandated that the Secretary of Commerce immediately initiate, through the Secretary of State and in consultation with the cabinet Secretary responsible for the U.S. Coast Guard, negotiations with each foreign government which conducted, or authorized its nationals to conduct, driftnet fishing in those waters. *See* Pub.L. No. 100–220, § 4006, 101 Stat. at 1479. That statute was expanded by the Driftnet Act Amendments of 1990, Pub.L.No. 101–627, § 107, 104 Stat. 4441 (Nov. 28, 1990), to report findings of Congress, including that

the continued widespread use of large-scale driftnets beyond the exclusive economic zone of any nation is a destructive fishing practice that poses a threat to living marine resources of the world's oceans, including but not limited to the North and South Pacific Ocean and the Bering Sea[.]

16 U.S.C. § 1826(b)(1). The policy of the Congress was declared to be

(1) implement the moratorium called for by the United Nations General Assembly in Resolution Numbered 44–225;

(2) support the Tarawa Declaration and the Wellington Convention for the Prohibi-

---

**1.** Pub.L. No. 100–220, § 4002, 101 Stat. at 1477.

tion of Fishing with Long Driftnets in the South Pacific; and

(3) secure a permanent ban on the use of destructive fishing practices, and in particular large-scale driftnets, by persons or vessels fishing beyond the exclusive economic zone of any nation.

16 U.S.C. § 1826(c). Whereupon the members of the President's cabinet covered by the 1987 enactment were directed to (d) "seek to secure international agreements to implement immediately the findings [and] policy, ... in particular an international ban on large-scale driftnet fishing", based upon ten enumerated considerations and (e) to report to Congress every year, starting not later than January 1, 1991, the results of such attempts. *See* 16 U.S.C. § 1826(d) and (e).

Thereafter, the High Seas Driftnet Fisheries Enforcement Act came into existence, reporting ten renewed findings on the part of Congress, including:

(4) The United Nations, via General Assembly Resolutions numbered 44–225, 45–197, and most recently 46–215 ..., has called for a worldwide moratorium on all high seas driftnet fishing by December 31, 1992, in all the world's oceans, including enclosed seas and semi-enclosed seas.

(5) The United Nations has commended the unilateral, regional, and international efforts undertaken by members of the international community and international organizations to implement and support the objectives of the General Assembly resolutions.

(6) Operative paragraph (4) of United Nations General Assembly Resolution numbered 46–215 specifically "encourages all members of the international community to take measures individually and collectively to prevent large-scale pelagic driftnet fishing operations on the high seas of the world's oceans and seas".

106 Stat. at 4900. The policy of the United States is stated to be (1) implementation of UNGA Resolution 46–215,

(2) bring about a moratorium on fishing in the Central Bering Sea, or an international conservation and management agreement to which the United States and the Russian Federation are parties that regulates fishing in the Central Bering Sea; and

(3) secure a permanent ban on the use of destructive fishing practices, and in particular large-scale driftnets, by persons or vessels fishing beyond the exclusive economic zone of any nation.

106 Stat. at 4901. Section 101 of the act, which is codified as 16 U.S.C. § 1826a, provides:

**(a) Denial of port privileges**

**(1) Publication of list**

Not later than 30 days after November 2, 1992, and periodically thereafter, the Secretary of Commerce, in consultation with the Secretary of State, shall publish a list of nations whose nationals or vessels conduct large-scale driftnet fishing beyond the exclusive economic zone of any nation.

**(2) Denial of port privileges**

The Secretary of the Treasury shall, in accordance with recognized principles of international law—

**(A)** withhold or revoke the clearance required by section 91 of the Appendix to Title 46 for any large-scale driftnet fishing vessel that is documented under the laws of the United States or of a nation included on a list published under paragraph (1); and

**(B)** deny entry of that vessel to any place in the United States and to the navigable waters of the United States.

**(3) Notification of nation**

Before the publication of a list of nations under paragraph (1), the Secretary of State shall notify each nation included on that list regarding—

**(A)** the effect of that publication on port privileges of vessels of that nation under paragraph (1); and

**(B)** any sanctions or requirements, under this Act or any other law, that may be imposed on that nation if nationals or vessels of that nation continue to conduct large-scale driftnet fishing beyond the exclusive economic

zone of any nation after December 31, 1992.

(b) **Sanctions**

(1) **Identifications**

(A) **Initial identifications**

Not later than January 10, 1993, the Secretary of Commerce shall—

(i) identify each nation whose nationals or vessels are conducting large-scale driftnet fishing beyond the exclusive economic zone of any nation; and

(ii) notify the President and that nation of the identification under clause (i).

(B) **Additional identifications**

At any time after January 10, 1993, whenever the Secretary of Commerce has reason to believe that the nationals or vessels of any nation are conducting large-scale driftnet fishing beyond the exclusive economic zone of any nation, the Secretary of Commerce shall—

(i) identify that nation; and

(ii) notify the President and that nation of the identification under clause (i).

(2) **Consultations**

Not later than 30 days after a nation is identified under paragraph (1)(B), the President shall enter into consultations with the government of that nation for the purpose of obtaining an agreement that will effect the immediate termination of large-scale driftnet fishing by the nationals or vessels of that nation beyond the exclusive economic zone of any nation.

(3) **Prohibition on imports of fish and fish products and sport fishing equipment**

(A) **Prohibition**

The President—

(i) upon receipt of notification of the identification of a nation under paragraph (1)(A); or

(ii) if the consultations with the government of a nation under paragraph

(2) are not satisfactorily concluded within ninety days, shall direct the Secretary of the Treasury to prohibit the importation into the United States of fish and fish products and sport fishing equipment (as that term is defined in section 4162 of Title 26) from that nation.

(B) **Implementation of prohibition**

With respect to an import prohibition directed under subparagraph (A), the Secretary of the Treasury shall implement such prohibition not later than the date that is forty-five days after the date on which the Secretary has received the direction from the President.

(C) **Public notice of prohibition**

Before the effective date of any import prohibition under this paragraph, the Secretary of the Treasury shall provide public notice of the impending prohibition.

(4) **Additional economic sanctions**

(A) **Determination of effectiveness of sanctions**

Not later than six months after the date the Secretary of Commerce identifies a nation under paragraph (1), the Secretary shall determine whether—

(i) any prohibition established under paragraph (3) is insufficient to cause that nation to terminate large-scale driftnet fishing conducted by its nationals and vessels beyond the exclusive economic zone of any nation; or

(ii) that nation has retaliated against the United States as a result of that prohibition.

(B) **Certification**

The Secretary of Commerce shall certify to the President each affirmative determination under subparagraph (A) with respect to a nation.

(C) **Effect of certification**

Certification by the Secretary of Commerce under subparagraph (B) is deemed to be a certification under . . .

[22 U.S.C. § 1978(a) ], as amended by this Act.

As just shown, among other statutes, this Enforcement Act amended Title 22, U.S.C., governing Foreign Relations and Intercourse, in particular, the so-called Pelly Amendment to the Fishermen's Protective Act of 1967, expanding its purview from "fish products" to "any products from the offending country". *Compare* 22 U.S.C. § 1978 (1988) *with* Pub.L. No. 102–582, § 201, 106 Stat. at 4904 *and* H.R.Rep. 262, Part 1, 102d Cong., 2d Sess. 11 (Oct. 22, 1992).

## D

This is the regime of law which the plaintiffs allege the defendants have disregarded upon a representation that

> [i]nformation about Italian violations in the Mediterranean Sea of the U.N. moratorium and the High–Seas Driftnet Fisheries Enforcement Act has been provided to both the State Department and the Commerce Department. Plaintiffs and other environmental organizations have provided such information to defendants' representatives and have urged defendants to certify Italy under the ... Enforcement Act.

Complaint para. 47. Their first pleaded cause of action alleges a violation by defendant Brown of section 1826a(b)(1)(A), *supra.* The second count avers that, by failing to identify Italy as a country whose nationals or vessels are conducting large-scale driftnet fishing beyond the exclusive economic zone of any nation, as required by section 1826a(b)(1)(B), *supra,* the Secretary of Commerce has acted arbitrarily, capriciously and not in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Among other relief, the plain-

tiffs pray for declarations adjudging defendant Brown in violation of both subsections of 16 U.S.C. § 1826a(b)(1) and for writs of mandamus, directing him to implicate Italy thereunder.

The court's jurisdiction is alleged to be under 28 U.S.C. § 1581(i)(3) and (4) and 28 U.S.C. § 1331.

## II

As indicated above, the defendants have interposed a motion "[p]ursuant to Rule 12(b)(1) of the Rules of this Court ... to dismiss plaintiffs' action for lack of standing." At the hearing thereon, counsel adhered to that choice of subsection of Rule 12(b)[2], which authorizes assertion of the defense of lack of jurisdiction over the subject matter by way of motion, as opposed to subsection (5) of that rule, which permits similar presentation of the defense of failure to state a claim upon which relief can be granted.[3]

■ Courts have treated the issue of standing as subsumed within that latter defense. *See, e.g., Animal Legal Defense Fund v. Quigg,* 932 F.2d 920 (Fed.Cir.1991); *Physicians' Education Network, Inc. v. Dep't of Health, Education & Welfare,* 653 F.2d 621 (D.C.Cir.1981); *Benjamin v. The Aroostook Medical Center, Inc.,* 57 F.3d 101 (1st Cir. 1995); *G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762 (2d Cir.1995); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250 (3d Cir.1994); *Bauer v. Sweeny,* 964 F.2d 305 (4th Cir.1992); *Whalen v. Carter,* 954 F.2d 1087 (5th Cir.1992), *McCready v. Michigan State Bar,* 881 F.Supp. 300 (W.D.Mich.1995); *Triad Associates, Inc. v. Robinson,* 10 F.3d 492 (7th Cir.1993); *Burton v. Central Interstate Low–Level Radioactive Waste Compact Comm'n,* 23 F.3d 208 (8th Cir.), *cert. de-*

---

**2.** *See* transcript of hearing ("Tr."), pp. 94–95. Counsel have also adhered to their right under CIT Rule 7(d) to file a reply in support of their dispositive motion, which was received August 11, 1995. However, in addition to continuing to contend that the plaintiffs fail to satisfy the elements required for standing before this court, the defendants now argue, among other things, that this action is not reviewable under the Administrative Procedure Act because there has been no final agency determination, which the Driftnet

Enforcement Act leaves entirely within the discretion of the Secretary of Commerce.

This proliferation of grounds upon which the defendants seek dismissal has brought forth a motion from the plaintiffs to file a surreply, which is hereby granted.

The new grounds are discussed in point IV hereinafter.

**3.** That defense is numbered subsection (6) of Rule 12(b) of the Federal Rules of Civil Procedure.

nied, —— U.S. ——, 115 S.Ct. 366, 130 L.Ed.2d 318 (1994); *Barrus v. Sylvania*, 55 F.3d 468 (9th Cir.1995); *Roman v. Cessna Aircraft Co.*, 55 F.3d 542 (10th Cir.1995); *Capeletti Brothers, Inc. v. Broward County*, 738 F.Supp. 1415 (S.D.Fla.1990), *aff'd*, 931 F.2d 903 (11th Cir.), *cert. denied*, 501 U.S. 1238, 111 S.Ct. 2871, 115 L.Ed.2d 1037 (1991); *Mitsuboshi Belting Limited v. United States*, 17 CIT 1158, Slip Op. 93–205, 1993 WL 437388 (Oct. 22, 1993). While courts have also considered standing to be within the ambit of subject-matter jurisdiction[4], in essence each is a separate concern. *See, e.g., Baker v. Carr*, 369 U.S. 186, 198–208, 82 S.Ct. 691, 699–705, 7 L.Ed.2d 663 (1962). The focus of the defense of lack of subject-matter jurisdiction is on the authority of the court chosen to hear and decide the claims presented, while lack of standing focuses on the parties making that choice of forum and those claims. *See generally Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

## A

■ Whatever their desired avenue, the court concurs with the defendants that "it is unnecessary to look to facts adduced outside the pleadings"[5] to render a decision thereon. To the extent they continue to adhere to CIT Rule 12(b)(1), the Customs Courts Act of 1980 confers exclusive jurisdiction upon this Court of International Trade over

> any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . .

> (3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

**4.** *See, e.g., Thompson v. County of Franklin*, 15 F.3d 245, 247–48 (2d Cir.1994).

**5.** Defendants' Reply Memorandum, p. 1. The defendants press this point out of apparent concern that the court, in the exercise of its discretion, might consider the voluminous declarations filed beforehand in support of plaintiffs' applications for immediate relief.

(4) administration and enforcement with respect to the matters referred to in paragraph . . . (3) of this subsection and subsections (a)–(h) of this section.

28 U.S.C. § 1581(i). And subsequent judicial interpretation has affirmed the exclusivity of this jurisdiction over an action like the one at bar. *E.g., Earth Island Institute v. Christopher*, 6 F.3d 648, 652 (9th Cir.1993) ("prohibitions on shrimp importation for environmental protection . . . clearly fall within the range of CIT jurisdiction identified by the Supreme Court in *K Mart" Corp. v. Cartier, Inc.*, 485 U.S. 176, 108 S.Ct. 950, 99 L.Ed.2d 151 (1988)). Moreover, the 1980 act provides that this court may order, among other forms of relief herein, a declaratory judgment, remand, or a writ of mandamus or prohibition. 28 U.S.C. § 2642(c)(1).

## B

■ As shown above, the Driftnet Enforcement Act required the Secretary of Commerce initially to identify each nation whose nationals or vessels were conducting large-scale driftnet fishing beyond the exclusive economic zone of any nation and to notify the President and those nation(s) of that identification "[n]ot later than January 10, 1993". 16 U.S.C. § 1826a(b)(1)(A). The plaintiffs complain of defendant Brown's failure to identify Italy in this regard and pray for relief therefrom per Count One of their complaint, which was served and filed in May 1995. In view of its timing, however, this pleaded cause of action fails to state a claim upon which relief can be granted within the meaning of CIT Rule 12(b)(5), if not also subsection (1) thereof[6]. That is, the statute of limitation controlling this action, brought as it is pursuant to 28 U.S.C. § 1581(i), requires that it have been commenced within two years after the causes pleaded herein

The court has not and will not on the issue(s) the defendants now raise.

**6.** *Cf. Former Employee of Eastman Christensen v. U.S. Secretary of Labor*, 15 CIT 496, 1991 WL 185715 (1991).

first accrued.[7] Ergo, defendants' motion to dismiss must be granted as to the first count of plaintiffs' complaint, albeit not on the ground of lack of standing.

The court cannot, and therefore, does not reach the same conclusion at this stage with regard to plaintiffs' second cause of action, which is based on subsection (b)(1)(B) ("Additional identifications") of the Enforcement Act, 16 U.S.C. § 1826a, *supra.* That provision applies "any time after January 10, 1993, whenever the Secretary of Commerce has reason to believe" unacceptable driftnetting is taking place. Clearly, plaintiffs' complaint thereon is not now untimely.

### C

■ As for their ability to proceed now on that count, in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), which was an action brought under the Endangered Species Act, 16 U.S.C. § 1531 *et seq.,* by "organizations dedicated to wildlife conservation and other environmental causes"[8], the Supreme Court reiterated that, at

the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."

504 U.S. at 561, 112 S.Ct. at 2137, quoting from *Lujan v. Nat'l Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990). Here, this court is unable to find that plaintiffs' allegations of injury, at first blush and as referred to in point I hereinabove, are materially different from

those considered to be sufficient "injury in fact" in *Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. 221, 230 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986), "in that the whale watching and studying of the[ ] members [of the plaintiffs HSUS, Defenders of Wildlife, *et al.* therein] will be adversely affected by continued whale harvesting, and this type of injury is within the 'zone of interests' protected by the Pelly and Packwood Amendments." That case, like the one at bar, was brought pursuant to the Administrative Procedure Act, and the Court found nothing in those amendments indicating congressional intent to foreclose judicial review. The same is true of the Driftnet Enforcement Act, *supra.* As the Court stated in *Sierra Club v. Morton,* 405 U.S. 727, 738, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972):

The trend of cases arising under the APA and other statutes authorizing judicial review of federal agency action has been toward recognizing that injuries other than economic harm are sufficient to bring a person within the meaning of the statutory language, and toward discarding the notion that an injury that is widely shared is *ipso facto* not an injury sufficient to provide the basis for judicial review.

Nonetheless, as the defendants point out, whatever the nature of the injury pleaded, it must be "fairly traceable to the[ir] allegedly unlawful conduct and likely to be redressed by the requested relief." Defendants' Memorandum in Support of Motion to Dismiss, p. 7, quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Per-

---

**7.** 28 U.S.C. § 2636(i). Once the defendants had referred to this statute in their papers in opposition to plaintiffs application for immediate relief, the plaintiffs abandoned that part of their application based on Count One, if not completely, then at least at this stage of the proceedings. *Compare* Reply Brief in Support of Plaintiffs' Motion for a Preliminary Injunction, p. 3 *with* Tr. at 5–6. They also argue in that brief, page 4, note 1 that they are

troubled by defendants' claim that Count I is barred by a two-year statute of limitations applicable· to claims brought before this court. Prior to the ruling in *Earth Island Institute v. Brown,* 28 F.3d 76 (9th Cir.1994), claims like

this one were brought in federal district courts and were subject to the six year statute of limitations applicable generally to claims against the government. Requiring such claims to be brought before the Court of International Trade should not diminish plaintiffs' rights.

Of course, this point is better presented to Congress, along with the historical fact that the *Earth Island Institute* decision cited actually relied on the earlier *Earth Island Institute v. Christopher,* 6 F.3d 648 (9th Cir.1993), decision to the same effect. *See* 28 F.3d at 78, *cert. denied,* —— U.S. ——, 115 S.Ct. 509, 130 L.Ed.2d 417 (1994).

**8.** 504 U.S. at 559, 112 S.Ct. at 2135.

haps, on final analysis, the plaintiffs will not have satisfied these requirements. For the moment, however, with only the complaint at hand, this court cannot concur with defendants' initial, proffered assessment that the plaintiffs are incapable of establishing any causal connection to, or redress of, the injuries they allege. *Cf. Earth Island Institute v. Christopher*, 19 CIT ——, 890 F.Supp. 1085 (1995).

### III

■ In fact, in their papers in support of the application for immediate relief, the plaintiffs boldly posture that they "are virtually certain to prevail on the merits of their claims."[9] Of course, that relief is extraordinary and can only be granted upon showing:

(1) A threat of immediate irreparable harm; (2) that the public interest would be better served by issuing than by denying the injunction; (3) a likelihood of success on the merits; and (4) that the balance of hardship on the parties favor[s issuance].

*S.J. Stile Associates, Ltd. v. Snyder*, 68 CCPA 27, 30, C.A.D. 1261, 646 F.2d 522, 525 (1981); *American Stevedoring Inc. v. U.S. Customs Service*, 18 CIT ——, ——, 852 F.Supp. 1067, 1071 (1994). That is, failure to bear the burden of persuasion as to any one of these four factors is ground for denial of an application. *E.g., Bomont Industries v. United States*, 10 CIT 431, 638 F.Supp. 1334 (1986). *See FMC Corporation v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993).

■ Assuming arguendo that plaintiffs' regard for the substantive issues of law they raise is not without foundation, this and other courts have held that although the

extraordinary remedy of a preliminary injunction is not available unless the moving party's burden of persuasion is met as to all four of the above factors, the showing of likelihood of success on the merits is in inverse proportion to the severity of the injury the moving party will sustain without injunctive relief.

*Daido Corporation v. United States*, 16 CIT 987, 997, 807 F.Supp. 1571, 1579–80 (1992), quoting *Smith Corona Corp. v. United States*, 11 CIT 954, 965, 678 F.Supp. 285, 293 (1987), quoting *Hyundai Pipe Co. v. U.S. Department of Commerce*, 11 CIT 238, 243, 1987 WL 8807 (1987), and citing *Ceramica Regiomontana, S.A. v. United States*, 7 CIT 390, 395, 590 F.Supp. 1260, 1264 (1984), and *American Air Parcel Forwarding Co. v. United States*, 1 CIT 293, 300, 515 F.Supp. 47, 53 (1981). Here, however, the plaintiffs fail to satisfy even such proportionate standard of analysis.

■ To be sure, the court has held in preceding point II of this opinion that plaintiffs' complaint, on its face, establishes sufficient harm for this action to proceed, but neither it nor perusal of the declarations of plaintiffs' counsel dated June 15 and July 10, 1995 and of George Berry (May 29), Nicolaos Charalambides (July 2), Patricia Forkan (June 2), Alessandro Gianni' (June 15 and Aug. 3), Katherine Hanly (May 30), Erich Hoyt (May 26), Leesteffy Jenkins (May 26), Gerald Leape (June 1), Helen McLachlan (June 1), David C. Phillips (May 30), William J. Snape, III (May 31), Rebecca A. Staffel (June 15 and July 10), Chris Stroud (May 26) and Andrew Troia (June 26, 1995) and of some 56 numbered exhibits presented along with them leads the court to find that the injuries they claim to suffer would be irreparable in the absence of an immediate writ of mandamus against the defendant(s). Indeed, these voluminous papers are bereft of any contention to the contrary. Plaintiffs' brief can only claim that "illegal Italian driftnet fishing is causing immediate, irreparable harm to marine resources in the Mediterranean Sea."[10] Moreover, even if the plaintiffs themselves were similarly exposed to that severity of injury, instantaneous enforcement here of the law upon which they rely would not provide relief of comparable timing there.[11] Finally, if time is an element of

---

**9.** Brief in Support of Plaintiffs' Motion for a Preliminary Injunction, pp. 25, 38, 42.

**10.** *Id.* at 26. *See also id.* at 39, 42.

**11.** Apparently, the season for swordfish in that body of water runs from approximately May to October each year. *See* Tr. at 37.

irreparability [12], commencement of this action years after large-scale driftnetting came to be unacceptable has hardly advanced plaintiffs' cause for relief this moment, which presumably is a reason for the offer to merge their application with trial of the action on the merits in accordance with CIT Rule 65(a)(2).

## IV

At the hearing, the court expressed readiness to expedite final resolution of this action and thereupon denied a motion filed by the defendants to stay, pending decision of the application for immediate relief, their responding to ten concise, written interrogatories to the Departments of Commerce and State relevant to the claims in this action, a request to each for production of documents identified in response to three of the questions and three relevant requests to admit addressed to defendant Brown and served months ago by the plaintiffs. Upon denial of a stay, the defendants sought and obtained leave to present a motion for a protective order pursuant to CIT Rules 7 and 26.

On the eve of the hearing, the defendants had filed documents with the court purported to comprise their administrative record, and the gist of the motion for a protective order, which was received on August 9, 1995, is that

> there is no need for the court to look for evidence other than that contained in the administrative record upon which the agency based its decision.[13]

In other words, the

> scope of review in APA cases is limited to the administrative record that was considered, directly or indirectly, by the agency decision-maker at the time he made his decision.[14]

However, as foregoing footnote 2 indicates, defendants' more-recently filed reply in support of their motion to dismiss takes the position that this action is not reviewable under the Administrative Procedure Act "because there has been no final agency action." Defendants' Reply Memorandum, p. 16. It is also argued that the matter of which the plaintiffs complain is committed exclusively to executive-branch discretion, that the Driftnet Enforcement Act "contains no mechanism authorizing citizen suits seeking judicial review of agency action" [15] and lastly that this action "is also unripe." *Id.* at 17, n. 12.

## A

Each of these newly-asserted points is tenuous. The APA defines "agency action" to include "failure to act", 5 U.S.C. § 551(13), and it specifically provides for judicial intervention to "compel agency action unlawfully withheld or unreasonably delayed". 5 U.S.C. § 706(1). There are two exemptions from this grant of authority per 5 U.S.C. § 701(a)(2): Either the statute precludes judicial review, which is not the case here, or agency action is committed to its discretion by law, which is also not true. Stated another way, while the Enforcement Act does not have a citizen-suits provision like that of the Endangered Species Act, 16 U.S.C. § 1540(g)(1), the Supreme Court has noted that judicial review of agency action "is available absent some clear and convincing evidence of legislative intention to preclude review." *Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. at 230 n. 4, 106 S.Ct. at 2866 n. 4, citing *Block v. Community Nutrition Institute,* 467 U.S. 340, 345, 104 S.Ct. 2450, 2453, 81 L.Ed.2d 270 (1984); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507,

12. *See, e.g., Bomont Industries v. United States,* 10 CIT 431, 437, 638 F.Supp. 1334, 1339 (1986); *Daido Corporation v. United States,* 16 CIT 987, 997, 807 F.Supp. 1571, 1579–80 (1992).

13. Corrected Memorandum in Support of Defendants' Motion for Protective Order, p. 11.

14. *Id.* at 8, citing, *inter alia, Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985); *Camp v. Pitts,* 411 U.S.

138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Montgomery Ward & Co. v. Zenith Radio Corp.,* 673 F.2d 1254 (CCPA), *cert. denied sub nom. Zenith Radio Corp. v. United States,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982).

15. Defendants' Reply Memorandum, p. 13.

1511, 18 L.Ed.2d 681 (1967). To repeat from point IIC above, no such legislative intent is discernible from the statute at bar, or from the history underlying its enactment. Also, there is no indication in either its language or congressional history that the defendants are granted unfettered discretion. On the contrary, the court concludes from the plain language that Congress intended identification under 16 U.S.C. § 1826a(b)(1) to be mandatory. The Secretary of Commerce was not at liberty not to notify the President by January 10, 1993 in accordance with subsection 1826a(b)(1)(A) of each nation whose nationals or vessels were conducting large-scale driftnet fishing anywhere in the world beyond its exclusive economic zone, and defendant Brown has no discretion now under the lesser, reason-to-believe standard of subsection (b)(1)(B) not to notify the President of any such unlawful activity. Hence, defendants' attempt to argue that this action is not yet ripe for review is unfounded.

### B

■■■ That attempt has import, however, in light of counsel's continuing admission of "infirmities in the record"[16]. Indeed, the court has reviewed all of the materials filed by the defendants to date, save those delivered under seal, and has not discovered anything even arguably "the contested determination and the findings or report upon which such determination was based" or the "reported hearings or conferences conducted by the agency" contemplated by 28 U.S.C. § 2635(d)(1), CIT Rule 72(a) and the Administrative Procedure Act. Not only have such crucial elements failed to materialize, the defendants concede that underlying, relevant matter has been withheld, e.g.:

> ... [D]efendants did not include all tasking instructions issued by the Coast Guard Intelligence Coordination Center to the U.S. Naval fleet in the Mediterranean. These instructions direct the Navy to verify, if possible, reports of Italian driftnet fishing.

Defendants originally included all tasking instructions in the possession of the Department of State, including the first document in the series, issued in May 1994.... Based upon the May 1994 instructions, the Departments of State and Commerce believed, correctly, that the Coast Guard would continue tasking the Naval fleet in the same manner and with the same frequency until contrary instructions were issued. Consequently, the Departments of State and Commerce did not retrieve additional tasking instructions from the Coast Guard or include these additional instructions in the administrative record. Nevertheless, because the agencies relied upon the Coast Guard's representations that tasking instructions would continue until further notice, and because these tasking instructions substantiate their belief, we have obtained the instructions from the Coast Guard and will add them to the administrative record under separate cover.[17]

Also, the letter of transmittal of defendants' documents on the eve of the hearing, as well as the accompanying certification of an officer of the Department of State, report redaction or nonproduction of numerous documents. While this withholding of evidence may prove defensible, to date the defendants have not properly established in accordance with the rules of practice "privilege" or "state secrets" or the other grounds asserted, which inadequacy their counsel conceded at the hearing. See Tr. at 126.

In regard to the U.S. Coast Guard tasking instructions referred to, the defendants note that the

> principal difference between each tasking instruction was to direct the Mediterranean fleet where to look for alleged driftnet fishing based upon such factors as the most recent allegations of driftnet fishing by nongovernmental organizations, traditional locations of seasonal Italian fishing activities, and other intelligence information.[18]

---

**16.** *Supra* note 13. *Cf.* Tr. at 64.

**17.** Corrected Memorandum in Support of Defendants' Motion for Protective Order, pp. 6–7 (footnotes omitted).

**18.** *Id.* at 6, n. 4.

On their part, the plaintiffs, who profess interaction with, and encouragement of, the defendants to carry out their official responsibilities, and whose own materials confirm this, state unequivocally that "the certified record is missing some key documents that are presumably in the defendants' possession."[19] The defendants have now reacted to this representation with the following list:

(1) Report of the Commission of the European Communities entitled "Enforcement of Community Legislation Concerning Use of Driftnets in 1994["] (Nov. 25, 1994) . . .

(2) Antonio Di Natale and Giuseppe Notarbartolo di Sciara, "A review of the passive fishing nets and trap fisheries in the Mediterranean Sea and of the Cetacean Bycatch" . . .

(3) Giuseppe Notarbartolo di Sciara, "A note on the cetacean incidental catch in the Italian driftnet swordfish fishery, 1986–88["], Rep.Int.Whal.Commn. 40:459–460 (1990) . . .

(4) Report of the Workshop on Mortality of Cetacean in Passive Fishing Nets and Traps (Oct. 1990) . . .

(5) G.P. Donovan, Developments on Issues Relating to the Incidental Catches of Cetaceans Since 1992 and the UNCED Conference (pp. 609–613 of the 1994 IWC Report) . . .

(6) International Whaling Commission Scientific Committee Report, Small Cetacean Subcommittee (IWC/46/4 Annex G 1994) . . .

(7) S.P. Northridge, Driftnet Fisheries & Their Impacts on Non-target Species: A Worldwide Review, *Food & Agriculture Organization Fisheries Technical Paper No. 320*, (1991) . . .

(8) General Fisheries Council for the Mediterranean & International Commission for the Conservation of Atlantic Tunas Expert Consultation on Evaluation of Stocks of Large Pelagic Fishes in the Mediterranean Area (Sept. 17–23, 1992) . . .

(9) General Fisheries Council for the Mediterranean & International Commission for the Conservation of Atlantic Tunas Expert Consultation on Evaluation of Stocks of Large Pelagic Fishes in the Mediterranean Area (June 21–27, 1990) . . .

(10) Di Natale, Swordfish Fishery in the Southern Tyrrhenian Sea: A Brief Report (1985–1989) (1990 CFCM–ICCAT 158–66) . . .

(11) Di Natale, Interaction Between Marine Mammals and Scombridae Fishery Activities: The Mediterranean Case, (1990 GFCM–ICCAT, pp. 167–213) . . .

(12) Letter from Scientific Counselor Gregory J. Dunn to Senator Enzo Maiorca . . .

(13) "Driftnets Impact on Protected Species: Observers Data From the Italian Fleet and Proposal for a Model to Assess the Number of Cetaceans in the By–Catch," Third GFCM/ICCAT Expert Consultation on Evaluation of Stocks of Large Pelagic Fishes in the Mediterranean Area (Fuengirola, Spain, September 19–24, 1994) . . .

(14) Di Natale, "A Review of Driftnet Catches by the Italian Fleet: Species Composition, Observers Data, and Distribution Along the Net," Third GFCM/ICCAT Expert Consultation on Evaluation of Stocks of Large Pelagic Fishes in the Mediterranean Area (Fuengirola, Spain, September 19–24, 1994) . . .

(15) Documents memorializing a meeting between State Department Officials and Andrean Van Agt, the head of the European Union Delegation in Spring 1994;

(16) Film Footage taken by Greenpeace . . .

(17) Other, unidentified records of scientific conferences on driftnet fishing attended by the Department of Commerce officials;

**19.** Reply Brief in Support of Plaintiffs' Motion for a Preliminary Injunction, p. 4, n. 2.

(18) State Department documents monitoring consideration of the driftnet issue by the European Union Commission;

(19) Remaining pages of Administrative Record Document 70, which is an English translation of a French document, which French document appears as Administrative Record Document 71.[20]

Whether or not these documents are or were in defendants' possession, as the plaintiffs apparently believe, the former take the position that none of them

fulfill the criteria of 28 U.S.C. § 2635(d)(1) in that they were not (a) a copy of the contested determination and the findings or report upon which such determination was based, (b) a copy of a hearing or conference conducted by the agency, or (c) a document, comment, or other paper filed by the public, interested parties, or governments with respect to the agency's action.[21]

This may prove to be true, although defendants do offer to produce the Greenpeace videotape numbered (16) above and the missing pages of the document referred to at (19), but what is patent now is the incompleteness of that which even arguably can be called an administrative record.

In circumstances such as these here, where the defendants are also arguing that this action is not reviewable at all under the APA, discovery is appropriate—at least for the limited purpose of determining the actual nature and extent of defendants' action(s) and record thereof. *Cf. Sharp Corp. v. United States,* 13 CIT 951, 958, 725 F.Supp. 549, 555 (1989), and cases cited therein. None of plaintiffs' outstanding discovery requests appear to attempt to elicit anything more, and the responses thereto on the part of the defendants may well advance final disposition of this matter.

█ In permitting this discovery, let both sides, represented as they seem to be by able counsel, be warned, however, that this ruling is not to be taken as a license for its abuse. As the Supreme Court has opined:

> ... Of course, ... inquiry into the mental processes of administrative decisionmakers is usually to be avoided. *United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). And where there are administrative findings that were made at the same time as the decision, as was the case in *Morgan,* there must be a strong showing of bad faith or improper behavior before such inquiry may be made. But here there are no such formal findings and it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 420, 91 S.Ct. at 825, recited in *Nat'l Corn Growers Ass'n v. Baker,* 9 CIT 509, 511, 1985 WL 25782 (1985).

## V

In view of the foregoing discussion, defendants' motion to dismiss this action must be granted as to Count One of the complaint and denied as to Count Two. Their motion for a protective order as against plaintiffs' outstanding discovery requests must be, and it hereby is, denied.

Plaintiffs' application for an immediate writ of mandamus must be, and it hereby is, denied.

In the interest of expediting this action to final judgment, for which there appears to be good cause, the defendants are directed to answer the remaining complaint on or before September 1, 1995 and plaintiffs' outstanding interrogatories and requests to produce and to admit on or before September 15, 1995. A proposed form of pretrial order or dispositive motion is to be filed no later than October 6, 1995, at which time a date for trial or final hearing will be set.

So ordered.

---

**20.** Defendants' Motion for Protective Order, Exhibits 3 and 4, paras. 5.

**21.** *Id.,* paras. 6.