**Slip Op. 99-23**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**Before: Judge Judith M. Barzilay**
-------------------------------------------------- **x**

The Humane Society of the United States,      **:**
Humane Society International,
Defenders of Wildlife,                              **:**
                              Plaintiffs,                          Court No. 98-03-00557
                                                              **:**
                    v.
                                                              **:**
William J. Clinton, President,
William M. Daley, Secretary of Commerce, **:**
Madeline K. Albright, Secretary of State
                              Defendants.      **:**

-------------------------------------------------- **x**


[Plaintiffs' motion for summary judgment denied in part, granted in part. **Held:** Plaintiffs' request denied for writ of mandamus directing the President to impose trade sanctions on Italy pursuant to the High Seas Driftnet Fisheries Enforcement Act. Secretary of Commerce's certification of Italy under the High Seas Driftnet Fisheries Enforcement Act was not arbitrary, capricious or not in accordance with law. Secretary of Commerce has reason to believe large-scale driftnet fishing is being conducted beyond the exclusive economic zone of any nation by Italian nationals or vessels and is ordered to identify Italy pursuant to the Driftnet Act.]

Decided: March 5, 1999


Earthjustice Legal Defense Fund (Yuki Ishizuka, Patti Goldman) for Plaintiffs.

David W. Ogden, Acting Assistant Attorney General, Louis J. Schiffer, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Lucius B. Lau), Eileen Sobeck, Chief, Environment and Natural Resources Division Wildlife and Marine Resources Section (Mark A. Brown), Violanda Botet, Attorney-Adviser, Office of the Legal Advisor, United States Department of State, of counsel, Margaret F. Hayes, Assistant General Counsel for Fisheries National Oceanic and Atmospheric Administration, United States Department of Commerce, of counsel, for Defendants.

**OPINION**

**BARZILAY, JUDGE:**

**I. PROCEDURAL HISTORY**

In 1992 Congress passed the High Seas Driftnet Fisheries Enforcement Act, Pub. L. No. 102-582, 106 stat. 4900 (1992) (the "Driftnet Act"). This Act was one in a series of United States and international enactments with the purpose of reducing the detrimental effects on sea life caused by the use of large-scale driftnets in fisheries around the world.[1]

The Driftnet Act required, among other actions, that the Secretary of Commerce publish a list of nations whose nationals or vessels conduct large scale driftnet fishing beyond the exclusive economic zone of any nation, not later than 30 days after November 2, 1992 and that those nations be denied United States port privileges. *See* 16 U.S.C. § 1826a(a)(1)-(2) (1994). In addition, the Driftnet Act provides for ongoing action requiring the Secretary of Commerce to add to the list if a "reason to believe" exists that such activity is taking place. *See* 16 U.S.C. § 1826a(a)(1), 1826a(b)(B) (1994).

Once such an identification is made, vessels of that nation are to be denied port privileges in the United States, 16 U.S.C. § 1826a(a)(2), the President is to enter into consultations with the government of the identified country to effect an agreement that will immediately terminate the driftnet fishing, 16 U.S.C. § 1826a(b)(2), and if consultations "are not satisfactorily concluded within 90 days," the President is to direct the Secretary of the Treasury to prohibit importations of fish and

---

[1] See discussion in *Humane Society of the United States v. Brown*, 901 F. Supp. 338, 341-346 (CIT 1995) ("*Humane I*").

other related products from that country into the United States.[2] 16 U.S.C. § 1826a(b)(3). No action was taken by any of the governmental entities named in the Driftnet Act and in May 1995, Plaintiffs[3] filed suit for preliminary relief to compel the Secretary of Commerce to identify Italy. The Court found that Plaintiffs had standing to bring suit and that the government's inaction could be reviewed despite the lack of final agency action or a determination on the record. The Court ordered limited discovery but denied the application for a preliminary injunction. *See Humane I.*[4]

Plaintiffs next filed a motion for summary judgment pursuant to USCIT R. 56 compelling identification of Italy under the Driftnet Act. Defendants countered with a motion for judgment upon an agency record pursuant to USCIT R. 56.1 opposing such identification. The Court held that the case was properly before it pursuant to USCIT R. 56, that plaintiffs had standing to pursue the matter, that the Secretary of Commerce had reason to believe that Italian nationals were conducting large scale driftnet fishing and that, therefore, the decision not to identify was an abuse of discretion. *See Humane Society v. Brown*, 920 F. Supp. 178 (CIT 1996) ("*Humane II*").

This decision prompted the following actions on the part of the relevant United States government agencies. On March 28, 1996, the Secretary of Commerce ("Secretary") identified Italy as a nation for which there was reason to believe its nationals or vessels were conducting large-scale

---

[2] The Driftnet Act also names further actions that may be taken by the U.S. government should consultations not be successfully concluded, *see* 16 U.S.C. § 1826a(b)(4), but this provision is not at issue here.

[3] There were six plaintiffs in 1995: The Humane Society of the United States, Humane Society International, Defenders of Wildlife, Royal Society for the Prevention of Cruelty to Animals, Whale and Dolphin Conservation Society, and Earth Island Institute. Three remain as plaintiffs in this action.

[4] Count One of the complaint brought pursuant to 16 U.S.C. § 1826a(b)(1)(A) (initial identification) was dismissed as outside the relevant statute of limitations, 28 U.S.C. § 2636(i).

driftnet fishing beyond the exclusive economic zone of any nation and notified the President and the

Secretary of State of Italy's identification. AR 6. Pursuant to the identification, the Secretary of the

Treasury was directed, through an April 29, 1996, Federal Register Notice, to require certification

of Italian fish and fish products under the Dolphin Protection Consumer Information Act. AR 8.

Acting through the Department of State, the President entered into consultations with Italy,

which are required by the Driftnet Act. On July 22, 1996 and July 25, 1996, the Italian government

sent documents formalizing its agreement with the U.S. ("Agreement") to end driftnet fishing by its

nationals and vessels. AR 11, 13. The U.S. informed Italy on July 26, 1996, that its proposals were

sufficient to avoid the imposition of sanctions under the Driftnet Act. AR 12. The Secretary of

Commerce certified to the President and Congress on January 7, 1997, that Italy had terminated

illegal driftnet fishing. Accordingly, the certification requirement for Italian fish and fish products

was lifted.

Despite these actions and others that are described elsewhere in this opinion, Plaintiffs allege

that illegal driftnet fishing by Italian nationals and vessels continues in the Mediterranean Sea.

Plaintiffs brought this second action by summons and complaint on March 18, 1998, asking this

Court for injunctive and declaratory relief against the President and the Secretary of Commerce.

A. *Facts*[5]

Driftnet fishing is an indiscriminate method of fishing. Driftnets consist of single or multiple

panels of non-degradable plastic webbing which can be joined in links up to 30 kilometers long.

Fishers deploy the nets by suspending them vertically beneath the surface of the water between

---

[5] The facts provided herein are intended to provide general familiarity with the method of fishing at issue. For additional background *see Humane I & II*; *see also* Driftnet fisheries and their impacts on non-target species: a worldwide review, FAO Fisheries Technical Paper (1991).

buoys at the ocean surface and a weighted lead line at the bottom of the net. The driftnets are deployed at night when they are less visible to marine life and are allowed to drift with the winds and currents. The nets catch virtually all fish, marine mammals such as whales and dolphins, sea turtles, sea birds, and other marine wildlife. The fish and wildlife are captured when the mesh is caught behind their gills, or when they simply become entangled in the mesh. At dawn, fishers collect the driftnets, remove the target fish, and discard any non-target species caught in the net.

In 1991, the United Nations General Assembly passed numerous resolutions calling for a worldwide moratorium on large-scale high seas driftnets. The European Union adopted the U.N. Moratorium through a regulation and the United States, as noted above, passed the Driftnet Act.

Plaintiffs bring the present action requesting the Court to issue a writ of mandamus directing the President to impose sanctions on Italy, to enjoin the Secretary of Commerce to rescind his January 7, 1997 certification of Italy and, in the alternative, to enjoin the Secretary of Commerce to find that there is reason to believe Italy is a nation whose nationals or vessels are continuing to conduct large-scale driftnet fishing beyond the exclusive economic zone of any nation.

*B. Summary Judgment*

This case is before the Court on the parties' cross motions for summary judgment. Under USCIT R. 56(d), summary judgment is appropriate if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Neither party disputes the existence of the material facts at issue; the questions presented are purely legal and thus appropriately disposed of through summary judgment.

## II.  RULE 56

Defendants moved under USCIT R. 56.1 for Judgment Upon an Agency Record, while Plaintiffs moved for Summary Judgment under USCIT R. 56.  The Court finds that USCIT R. 56 is the applicable rule and thus treats Defendants' Motion for Judgment Upon an Agency Record as a cross-motion for summary judgment.  When cross-motions for summary judgment are before the Court "[e]ach party carries the burden on its own motion to show entitlement to judgment as a matter of law . . . ."  *Massey v. Del Labs.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997).

In the previous litigation between the parties the Court decided in Plaintiffs' favor that USCIT R. 56 governed as opposed to USCIT R. 56.1.  *See Humane II*, 920 F. Supp. at 182-83.  The reasoning in that decision is equally relevant in the case presently before the Court.  In *Humane II*, the Court examined what constitutes a record by comparing 28 U.S.C. § 2635(d)(1), USCIT R. 72(a) and the Administrative Procedure Act ("APA") noting that the contested determination was not published in the Federal Register, nor were there hearings, conferences or a report upon which the decision was based.  *See Humane I*, 901 F. Supp. at 350; *Humane II*, 920 F. Supp. at 183.  Here, although Defendants have instituted an informal agency consultation process and submitted the Secretary's memorandum upon which the decision is based,[6] there still is no publication in the Federal Register, nor were other formal APA rulemaking procedures followed.

USCIT R. 56.1 requires the movant to address the administrative determination by referencing the Federal Register Notice.  The relevant statute, 28 U.S.C. § 2635(d), upon which USCIT R. 72(a) is styled requires the submission of the contested determination, along with findings

---

[6] *See* AR 563 (deciding neither to withdraw the certification nor to identify Italy a second time).

or reports, transcripts of hearings or conferences and any other material received by the agency.  In this case, there are two documents which could embody the contested determination: the Secretary's January 7, 1997 certification letter and the October 21, 1998 decision memorandum.  These were records of informal agency consultations, but Defendants contend that these are not reviewable since they are not final action.  While informal agency action is perfectly acceptable, it does not lend itself, in this case, to review under USCIT R. 56.1; therefore, USCIT R. 56 is the appropriate path.  With regard to the proper standard of review, Defendants argue that *Shakeproof Indus. Prods. v. United States*, 104 F.3d 1309 (Fed. Cir. 1997) mandates that the Court review the agency's determination rather than making its own *de novo* determination.  Plaintiffs concede that proceeding under USCIT R. 56 does not provide a *de novo* review of the agency decision,  *Pl.'s Reply Br.* at 3-4.  The Court agrees and reviews this motion as per the applicable APA standard, 5 U.S.C. § 706(2)(A) (1994).

Defendants moved to strike several of Plaintiffs' submissions claiming that the case was properly before the Court under USCIT R. 56.1.[7]  Plaintiffs urge the Court to accept these documents, filed with the Court but not part of the administrative record, for explanatory purposes only. *Pl.'s Reply Br.* at 3.  In support of this position, Plaintiffs cite *Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir. 1988).  *Love* involved highly technical issues concerning whether to enjoin the Environmental Protection Agency from suspending registrations of a certain pesticide.  *Love*, 858

---

[7] Although the Defendants withdrew their Second and Third Motions to Strike at oral argument, some material is still subject to Defendants' original motion to strike.  The disputed submissions are as follows: Declaration of Yuki Ishizuka and exhibits 1) Driftnet fisheries and their impacts on non-target species: a worldwide review, FAO Fisheries Technical Paper (1991), 2) Commission Staff Working Paper, EC Commission (1995), 3) G.A. Res. 50/25, U.N. GAOR, 50th Sess., Agenda Item 96(c) (1996), 4) G.A. Res. 52/29, U.N. GAOR, 52nd Sess., Agenda Item 39(c) (1998), 5) Council Regulation 345/92, 1992 O.J. (L 42) 15–19, 6) Fisheries Council: Driftnets Finally Voted Out as Environmental Issues are Highlighted, Europe Environment, June 23, 1998 7-8; Declaration of William J. Snape, III, paragraphs 7-37.

F.2d at 1349. On appeal, the agency charged that the district court had impermissibly considered evidence outside of the administrative record. *Love*, 858 F.2d at 1356. While upholding the ability of the district court to consider such extrinsic evidence, the Court of Appeals for the Ninth Circuit cautioned district courts not to engage in weighing "the evidence to determine the correctness or wisdom of the agency's decision." *Love*, 858 F.2d at 1356. Although this case does not present questions of a technically complex nature, the Court considers the Plaintiffs' additional submissions useful for background, but also heeds the admonition contained in *Love* not to use that information in determining whether the agency acted properly. Furthermore, the Court is mindful of the pronouncements of the Supreme Court in both *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) and *Florida Power and Light Co. v. Lorion*, 470 U.S. 729 (1985) concerning the limited inquiry a reviewing court may make even of informal agency action. Because the Court finds that this case should proceed pursuant to USCIT R. 56, but that the proper standard of review is not *de novo*, the Court denies Defendants' outstanding motion to strike.

### III.  REVIEWING THE PRESIDENT'S ACTION/INACTION

Plaintiffs have requested the Court to order the President to impose trade sanctions pursuant to 16 U.S.C. § 1826a(b)(3)(A), which provides "if the consultations with the government of a nation . . . are not satisfactorily concluded within ninety days [the President] shall direct the Secretary of the Treasury to prohibit the importation into the United States of fish and fish products and sport fishing equipment . . . from that nation." 16 U.S.C. § 1826a(b)(3)(A) (1994).

Plaintiffs argue that the statutory language quoted above imposes a clear duty on the President to impose trade sanctions, *Pl.'s Moving Br.* at 45, and that their members are owed that

duty as they are within the "zone of interests" the Driftnet Act seeks to protect.[8] *Pl.'s Br.* at 47. Plaintiffs claim that subject matter jurisdiction and the waiver of sovereign immunity are provided by 28 U.S.C. § 1581(i) which vests this Court with exclusive jurisdiction over "[a]ny civil action commenced against the United States, its agencies, or its officers." It is true that 28 U.S.C. § 1581(i) provides subject matter jurisdiction to this Court in cases against the United States, its agencies, or officers arising out of any law providing for embargoes or other quantitative restrictions. But that does not automatically answer the question of the waiver of sovereign immunity *vis a vis* the President.

Defendants attempt the following syllogism: Only persons aggrieved by agency action within the meaning of the APA may commence an action before this Court; the Supreme Court on two occasions held that the President is not an agency within the meaning of the APA; therefore, Plaintiffs are not persons aggrieved by agency action and may not commence an action in this Court. Defendants' argue that since the President is not an agency within the meaning of the APA, per *Franklin v. Massachusetts*, 505 U.S. 788, 799 (1992) and *Dalton v. Specter*, 511 U.S. 462, 470 (1994), Plaintiffs do not have standing under 28 U.S.C. § 2631(i) to commence this action. Provided Plaintiffs do have standing, a waiver of sovereign immunity is needed to review the President's action, Defendants argue, and the waiver of sovereign immunity for actions under section 1581(i) is found in section 702 of the APA. The Court examines each argument.

---

[8] Whether the Plaintiffs fell within the Driftnet Act's zone of interests was decided by this Court in prior litigation between these same parties. *See Humane II*, 920 F. Supp. at 203-04. Accordingly, it is unnecessary to re-examine the issue. Even if the government is not collaterally estopped from re-litigating the issue, the Court finds the reasoning set forth in *Humane II* sound and adopts it.

*A. Jurisdiction*

1.  Subject Matter Jurisdiction

At the outset, a court must be satisfied that it has jurisdiction over the subject matter of the suit. Plaintiffs are correct in their allegation of jurisdiction under section 1581(i)(3) and (4), which grant this Court:

> exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for-
>
> . . . .
>
> (3) *embargoes* or other quantitative restrictions on the importation of merchandise *for reasons other than the protection of the public health or safety*; or
> (4) administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this section.

28 U.S.C. §§ 1581(i)(3)-(4) (emphasis added). This case clearly involves a dispute over the administration and enforcement of a law providing for an embargo on the importation of merchandise. *See Humane I*, 901 F. Supp. at 346 ("And subsequent judicial interpretation has affirmed the exclusivity of this jurisdiction over an action like the one at bar."). Because the Court finds it has jurisdiction over an action of this kind against the President pursuant to section 1581(i), it proceeds to determine whether Plaintiffs have standing and whether it can grant their requested relief.

2.  Standing under 28 U.S.C. § 2631(i)

Defendants dispute Plaintiffs' standing to commence an action to review the President's action/inaction. Defendants contend that section 2631(i)'s reference to the APA nullifies the section 1581(i)'s reference to officers of the United States. The President is an officer of the United States. *See e.g., Clinton v. Jones*, 520 U.S. 681, 699 n.29 (1997); *Franklin v. Massachusetts*, 505 U.S. 788,

799 (1992); *Nixon v. Fitzgerald*, 457 U.S. 731, 749-50 (1982). Defendants argue that for the Court to reach a review on the merits, not only must it be satisfied that jurisdiction exists under section1581(i), but it must also read section 2631(i)'s standing requirement and reference to a person "adversely affected or aggrieved by agency action" as restricting review of Presidential actions or inactions in light of the holdings in *Franklin* and *Dalton* that the President is not an agency within the meaning of the APA. *Franklin*, 505 U.S. at 796; *Dalton*, 511 U.S. at 470.

It is clear to the Court that section 2631(i) is not meant to be read as a restriction on section 1581(i). Despite case law holding the President is not an agency within the meaning of the APA, he continues to be an officer of the United States, and thus is subject to being sued in this Court under section 1581(i).[9] The legislative history shows that the intent of Congress in enacting section 2631(i) was "to correlate with and complement the broad grant of residual jurisdiction found in proposed section 1581(i)." *See* H.R. Rep. No. 96-1235, at 52 (1980), *reprinted in* 1980 U.S.C.C.A.N. 3729, 3764. It is a time-honored principle of statutory interpretation that a statute "should be interpreted so as not to render one part inoperative." *See Department of Revenue of Oregon v. ACF Indus.*, 510 U.S. 332, 340 (1994) (citation omitted); *see also Pac Fung Feather Co., Ltd. v. United States*, 19 CIT 1451, 1459-60, 911 F. Supp. 529, 536 (1995) ("The meaning of a term 'must also be construed in the context of [its] enactment by the legislature.'" (citation omitted)); *Bethlehem Steel Corp. v. United States*, 4 CIT 229, 233, 551 F. Supp. 1148, 1151 (1982) ("It is an acknowledged general rule that statutes which have the same purpose or which relate to the same matter or subject are *in pari materia* and are to be construed together."). It is especially apt to apply this canon of

---

[9] Whether this Court has the power to grant the relief that is requested against the President is a separate inquiry. *See Swan v. Clinton*, 100 F.3d 973, 976-81 (D.C. Cir. 1996).

statutory construction where subsequent decisional law would upset the intent of Congress in a way that could not have been foreseen.

Actions against the President in this Court have been brought to challenge whether a nation is to receive special tariff treatment under the Generalized System of Preferences, *see Florsheim Shoe Co. v. United* States, 744 F.2d 787 (Fed. Cir. 1984) and various presidential proclamations, *see United States v. George S. Bush &* Co., 310 U.S. 371 (1940); *United States Cane Sugar v. Refiners' Ass'n v. Block*, 683 F.2d 399 (C.C.P.A. 1982); *Aimcee Wholesale Corp. v. United States*, 468 F.2d 202 (C.C.P.A. 1972); *Kemet Electronics Corp. v. Barshefsky*, 976 F. Supp. 1012, 1024 (CIT 1997). To read the reference to the APA in section 2631(i) in the manner suggested by the Defendants would frustrate the intent of Congress expressed in section 1581(i) to provide judicial review of any civil action commenced against an officer of the United States. Additionally, precluding review of presidential actions affecting international trade would eliminate a longstanding practice of providing such review. Of course, Congress is free to correct the Court's interpretation, but in the absence of such direction, reading 28 U.S.C. §§ 1581(i) & 2631(i) *in pari materia* seems to effectuate best the intent expressed in the Customs Courts Act of 1980.

3. Sovereign Immunity

Defendants also argue that Plaintiffs cannot maintain their cause of action against the President because a waiver of sovereign immunity does not exist. According to the Defendants, the waiver must come from section 2631(i) with its reference to the general waiver of sovereign immunity found in the APA, 5 U.S.C. § 702, and since the President is not an agency within the meaning of the APA, an action cannot be maintained against him in this Court following the reasoning in *Franklin* and *Dalton*. Plaintiffs respond by stating that the waiver of sovereign

immunity is found within section 1581(i).

The Court need not reach this issue. Instead, the Court determines whether the President acted within the permissible bounds of the statute he is alleged to have violated before determining whether sovereign immunity has been waived for Presidential actions. *See Florsheim Shoe Co. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984); *accord Kemet Electronics Corp. v. Barshefsky*, 976 F. Supp. 1012, 1024 (CIT 1997).

*B. Writ of Mandamus*

Plaintiffs argue that the Driftnet Act imposes a non-discretionary duty upon the President to impose trade sanctions on Italy since the Agreement reached has been and continues to be violated. Accordingly, Plaintiffs request the Court to issue a writ of mandamus to the President directing him to order the Secretary of the Treasury to prohibit the importation into the United States of fish and fish products from Italy.

For mandamus to issue two elements must be satisfied: the plaintiff must have exhausted all avenues for relief; and the defendant must owe the plaintiff a clear non-discretionary duty. *See Heckler v. Ringer*, 466 U.S. 602, 616 (1984). In this case, it is uncontested that Plaintiffs have met the first requirement,[10] but it is beyond doubt that the duty owed is discretionary. Thus, the Court cannot issue a writ of mandamus directing the President to impose sanctions, through the Secretary of the Treasury, on Italian fish and fish products.

The Driftnet Act does impose certain duties on the President if the Secretary of Commerce

---

[10] Although the Defendants at one point raised the exhaustion argument, it was with respect to the 1998 fishing season. Presumably, the Defendants no longer adhere to this position since the Secretary of Commerce chose to support the 1997 certification for the 1998 fishing season after the Defendants' briefs had been filed. *See* AR 563.

notifies the President that he has identified a nation after having had "reason to believe that the nationals or vessels of [that] nation are conducting large-scale driftnet fishing beyond the exclusive economic zone of any nation. . . ." 16 U.S.C. 1826a(b)(1)(B) (1994). Upon receipt of this notification, the President must commence consultations with that nation within thirty days, 16 U.S.C. § 1826a(b)(2), must attempt to obtain an agreement with that nation to effect the immediate termination of illegal driftnet fishing beyond the exclusive economic zone of any nation, 16 U.S.C. § 1826a(b)(2), and must impose sanctions if "consultations . . . are not *satisfactorily concluded* within ninety days . . . ." 16 U.S.C. § 1826a(b)(3) (emphasis added).

In *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221 (1986) the Supreme Court addressed the issue of discretionary language found in the statutory scheme established by the Pelly and Packwood Amendments to the Fishermen's Protective Act of 1967. Congress passed the amendments to enable the United States to enforce various provisions of the International Convention for the Regulation of Whaling, including the International Whaling Commission's quotas. *Id.* at 225. The relevant portion of the Court's opinion discussed the discretion vested in the Secretary of Commerce by Congress to carry out the purpose of the statute. "The statute directs the Secretary of Commerce to certify to the President if 'nationals of a foreign country, directly or indirectly, are conducting fishing operations in a manner or under circumstances which *diminish the effectiveness* of an international fishery conservation program. . . .'" *Id.* at 225 (emphasis added). The Court found that Congress had neither defined the operative language nor did it specify the factors the Secretary was bound to consider. *Id.* at 232. Importantly, the Court noted that it would have been a simple matter for Congress to mandate the procedure the Secretary must follow. *Id.* at 232.

Likewise, in this case, Congress could have directed the President to impose sanctions following identification by the Secretary. Instead, Congress chose a different route manifest in the plain language of the Driftnet Act requiring the President to initiate consultations following an identification but to impose sanctions only if the consultations were not satisfactorily concluded. Nowhere does the legislative history indicate a contrary intent by Congress.[11] Indeed, the Driftnet Act demonstrates Congress' ability to include both mandatory and directory language. *Compare* 16 U.S.C. § 1826a(b)(2) ("the President shall enter into consultations") *with* 16 U.S.C. § 1826a(b)(3) (the President shall direct the Secretary of the Treasury to prohibit imports if consultations "*are not satisfactorily concluded*") (emphasis added).

The decision to impose import prohibitions is clearly not a ministerial duty. Congress vested discretion in the President by allowing him to render the final decision on whether to impose sanctions. The President alone is left to decide whether the consultations are satisfactorily concluded, the only statutory mechanism that triggers import prohibitions. Therefore, the Court

---

[11] Recognizing that isolated incidents might still occur, the legislative history indicates that such activity would not necessarily trigger the imposition of sanctions. *See* H.R. Rep. No. 102-262(II), at 5 (1992), *reprinted in* 1992 U.S.C.C.A.N. 4090, 4106. While this indicates that Congress intended to reach all but isolated occurrences of large-scale driftnet fishing it does not direct the President to impose sanctions based on any criteria other than consultations that are not satisfactorily concluded. Moreover, an important distinction is drawn in the legislative history between the purpose of the consultations, which is to obtain an agreement that will immediately end the use of driftnets, and the satisfactory conclusion of the consultations. *See* H.R. Rep. No. 102-262(II), at 4 (1992), *reprinted in* 1992 U.S.C.C.A.N. 4090, 4105-06. Congress could have defined satisfactory conclusion with reference to whether the purpose of the consultations was achieved. Instead, the term is not defined, and from this silence it may be inferred Congress granted the President alone the discretion to decide whether consultations are satisfactorily concluded. Congress also noted its intent to provide "some flexibility procedurally for dealing with the unlikely situation that a country may be in violation of the U.N. moratorium after December 31, 1992." H.R. Rep. No. 102-262(II), at 5 (1992), *reprinted in* 1992 U.S.C.C.A.N. 4090, 4106.

finds that it cannot issue a writ of mandamus to the President because the duty owed to Plaintiffs, if any, is not ministerial. Accordingly, the Court need not and does not reach the question of whether sovereign immunity is at issue.

### IV. THE SECRETARY OF COMMERCE'S CERTIFICATION

Neither party disputes that the Secretary of Commerce's actions can be reached through the APA. Furthermore, the parties agree that the appropriate standard of review is whether the Secretary's decision to certify was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". 5 U.S.C. § 706 (2)(A) (1994). Here, the Court must examine whether the Secretary's certification was arbitrary or capricious. The Driftnet Act does not vest any discretion in the Secretary to certify or not, only that he must do so before denial of port privileges and/or sanctions terminate.

Section 1826b of the Driftnet Act titled "Duration of denial of port privileges and sanctions" requires that the denial of port privileges and sanctions, if any have been imposed, are to continue "until such time as the Secretary of Commerce certifies to the President and the Congress that such [one identified by the Secretary of Commerce] nation has terminated large-scale driftnet fishing by its nationals and vessels beyond the exclusive economic zone of any nation." 16 U.S.C. § 1826b (1994). Although Congress used the term "certification" in section 1826a(b)(4)(B) and in section 1826b, certification has a distinct meaning within each section. Port privileges cannot be restored,

nor can sanctions be revoked until the Secretary makes a section 1826b certification.[12]

Neither the express words of the statute nor the legislative history define what form a certification made under section 1826b is to take, and neither does the statute address the problem chiefly at issue here, what is to be done if a nation terminates and later is alleged to have resumed illegal large-scale driftnet fishing. *See* H.R. Rep. No. 102-262(I), at 15 (1992), *reprinted in* 1992 U.S.C.C.A.N. 4090, 4102; AR 22. However, it is apparent from the statute's structure that certification terminates the process that begins with identification. Plaintiffs request the Court to declare invalid the Secretary of Commerce's January 7, 1997, certification that Italy had terminated large-scale driftnet fishing by its nationals and vessels and to enjoin the Secretary to rescind it. *Compl.* at 15.

On January 7, 1997, then Secretary of Commerce Michael Kantor wrote to the President and Congress certifying that Italy had "terminated large-scale driftnet fishing by its nationals and vessels." AR 20. The certification, made pursuant to the Driftnet Act, 16 U.S.C. § 1826b, was based on the agreement concluded with Italy on July 26, 1996. AR 20. Nothing else in the certification letter discusses other bases for the decision beyond the conclusion of the Agreement. Following the APA's mandate, the Court can review only whether the Secretary's certification decision was rational on the basis of the given explanation.

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that

---

[12] The certification required under section 1826b is not a certification for purposes of section 8(a) of the Fishermen's Protective Act of 1967 (22 U.S.C. § 1978(a) (1994)). Confusingly, there are two certifications within the Driftnet Act. One, pursuant to section 1826b, acts to restore a country's port privileges and revoke sanctions. The other is deemed to be a certification under section 8(a) of the Fishermen's Protective Act of 1967, which allows additional import sanctions to be imposed.

> of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."

*Motor Vehicle Mfr. Ass'n, v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43 (1983) (citations omitted).

Additionally, the APA requires a court to review the agency decision on the basis of the administrative record. 5 U.S.C. § 706. Here, the agency's decision is embodied in the Secretary's January 7, 1997 letter to the President and Congress. The only stated reason the Court can review is the successful conclusion of the Agreement with Italy. A sole reason can be sufficient to uphold the Secretary's decision provided he considered the relevant factors and did not make a clear error of judgment. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). An agency decision will be found to be arbitrary and capricious:

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfr. Ass'n, Inc.*, 463 U.S. at 43.

However, "[t]he reviewing court should not attempt . . . to make up for . . . deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.' We will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Motor Vehicle Mfr. Ass'n, Inc.*, 463 U.S. at 43 (citations omitted). Accordingly, the Court must decide whether at the time the certification was made it was rational for the Secretary to conclude that the Agreement meant Italy had "terminated large-scale driftnet fishing by its

nationals and vessels beyond the exclusive economic zone of any nation." 16 U.S.C. § 1826b (1994). The Court will not review the Secretary's decision in light of what has since occurred, rather on the basis of the evidence at the time it was made. *See Daido Corp. v. United States*, 18 CIT 1053, 1059, 869 F. Supp 967, 973 (1994).

Plaintiffs note correctly that as of the date of the Secretary's certification, the Agreement with Italy had not been tested. Since the driftnet fishing season generally ends in August, the July 26 Agreement could not be tested in 1996. The statute allows the Secretary to certify when the identified "nation has terminated large-scale driftnet fishing by its nationals and vessels beyond the exclusive economic zone of any nation." 16 U.S.C. § 1826b. Thus, unlike the provision governing identification, found at 16 U.S.C. § 1826a(b)(1)(B), whose focus is on whether illegal large-scale driftnet fishing is being conducted by a country's nationals, the certification provision's focus is on the actions of the nation and the nationals. Though the distinction is subtle, it is significant. When determining whether to identify a nation under 16 U.S.C. § 1826a(b)(1)(B), the Secretary must view the conduct of nationals, irrespective of what measures the nation is taking to end it. The decision to certify, however, requires the Secretary to determine whether the nation, presumably its government, has terminated illegal large-scale driftnet fishing by its nationals and vessels. The Court now examines the terms of the Agreement to judge whether it was rational for the Secretary to conclude that the proposed measures had terminated large-scale driftnet fishing by Italian nationals or vessels beyond the exclusive economic zone of any nation.

Italy outlined the measures it committed to undertake pursuant to the consultations in a "note verbale" and in a statement by the Italian Minister of Agriculture. First, Italy announced its intention to submit a voluntary rationalization and conversion plan to provide for the cancellation of all

driftnet fishing licenses, accompanied by a surrender of the driftnets, between 1997 and 1999. AR 11. Second, Italy committed to introduce a ban on the use of Sardinian ports by driftnet vessels from other ports. AR 11. The Sardinian port ban subsequently passed. AR 16. Third, Italy announced its intention to pass a law with an escalation of sanctions for fishing with illegal driftnets. AR 11. These three measures provided the basis upon which the Secretary certified Italy pursuant to 16 U.S.C. § 1826b, the effect of which was to end the denial of U.S. port privileges, as well as certain certification requirements, to Italian large-scale driftnet fishing vessels commenced by the Secretary of Treasury's April 29, 1996 Federal Register Notice. AR 8.

Plaintiffs request the Court to declare that the Secretary's certification was arbitrary, capricious and not in accordance with the Driftnet Act. *Compl.* at 15. In support, Plaintiffs point to evidence that driftnet fishing continued in the period between the conclusion of the Agreement and the certification. Plaintiffs also cite numerous administrative record excerpts wherein various United States government officials express displeasure with Italy's failure to implement the terms of the Agreement. Plaintiffs first argument conflates the standard for identifying Italy under 16 U.S.C. § 1826a(b)(1)(B) with deciding that Italy was taking appropriate measures to end illegal large-scale driftnet fishing under 16 U.S.C. § 1826b. For the purpose of deciding whether the certification was reasonable, the Court must look to the evidence before the Secretary as of January 7, 1997, detailing whether Italy had ended illegal driftnet fishing by its nationals or vessels.

When the Secretary certified to the President and Congress that Italy had acted to end large-scale driftnet fishing, Italy had fulfilled two out of three major provisions of the Agreement. On December 20, 1996, the European Union Fisheries Council voted in favor of the Italian driftnet conversion plan, AR 129, leaving only the formality of full approval. AR 132. This element of the

Agreement was considered to be of primary importance for Italy to fulfill its obligations. AR 116. The sole unfulfilled element of the Agreement was the passage of a law to increase penalties on driftnet fishing, but an assurance was given by Italian officials that the law would pass before the commencement of the 1997 fishing season.[13] AR 114, 116.

Even if the Court were to disagree with the Secretary's decision to certify Italy, it cannot overturn the Secretary's decision provided it is not arbitrary, nor capricious and that it is in accordance with the Driftnet Act. *See Motor Vehicle Mfr. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). Based on the evidence before the Secretary at the time he certified Italy, the Court cannot conclude that his actions were arbitrary, capricious or not in accordance with law. The Secretary did not certify Italy immediately upon conclusion of the Agreement and although the Court may question the Secretary's timing in making the certification, it cannot overturn his decision on that basis. *See Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984) ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."). It was not unreasonable for the Secretary to certify, on the record before him, that Italy had terminated large-scale driftnet fishing by its nationals or vessels beyond the exclusive economic zone of any nation. Since Italy had fulfilled most of its commitments contained in the Agreement, it was not arbitrary, capricious or not in accordance with the Driftnet Act for the Secretary to conclude Italy had terminated illegal driftnet fishing.

---

[13] There were erroneous reports of illegal driftnetting soon after the Agreement was concluded, but officials of the two countries met to discuss and resolve them on July 30, 1996. AR 49. In addition, Italy subsequently agreed to cooperate with any efforts by U.S. driftnet fishing experts, including those from the National Marine Fisheries Service ("NMFS"). AR 64.

## V.  WITHDRAWING THE CERTIFICATION OF ITALY

In addition to requesting the Court to find the initial certification of Italy invalid, Plaintiffs request the Court to find that the Secretary should have withdrawn the certification.  *Compl.* at 15. Plaintiffs rely on the same arguments to support both invalidation of the certification and withdrawal.  Whether the Secretary should be ordered to withdraw the certification requires an examination of events that transpired during the time period following certification through to the present.  Not all were uniformly positive.

The importance of the conversion plan to the Agreement is cited a number of times on the record.  AR 65, 111, 190.  Concerns about the implementation of the Agreement surfaced in preparing for a February 1997 visit by Secretary of State Albright to Italy.  The record indicates that initially the driftnet issue would not be raised, but because of delays in the implementation of the conversion plan, U.S. officials decided to prepare the issue for discussion.  AR 160.  Italy had only limited control over the finalization of the plan.  Both the United Kingdom and Germany objected to the proposal, although it appears Italy tried to push the measure through quickly.  AR 173 at 2. U.S. officials continued to express displeasure with the delay as late as February 26.  AR 194.  In fact, the discussion among U.S. officials began to focus on the real possibility of sanctions.  AR 198, 199, 210.  At the end of April the conversion plan was finalized by the European Union Council. AR 278.

As of April 1997, another important element of the Agreement,  the sanctions law, had not passed the Italian Parliament and appeared to be delayed for four to five months.  AR 211 at 3. Despite urging by the U.S. government the record reflects that a sanctions law has still not passed.

The Driftnet Act does not address what circumstances would precipitate the withdrawal

of the certification.  Unfortunately, Congress has not addressed this issue within the statutory framework. *See e.g.,* H.R. Rep. No. 102-262(I), at 15 (1992), *reprinted in* 1992 U.S.C.C.A.N. 4090, 4102 (noting that the statute fails to address situations where a nation ceases then resumes illegal driftnet fishing).  Plaintiffs point to a memorandum from the National Oceanic and Atmospheric Administration's ("NOAA") Office of the General Counsel, wherein advice on the proper operation of the Act is given to support their claim that the certification can be withdrawn by the Secretary. AR 22.  Of course, legal advice by a subordinate to a superior on the interpretation of a statute does not bind the agency, *see Spirt v. Bechtel*, 232 F.2d 241, 244 (2d Cir. 1956), nor is it a definitive statement such that any departure from it without further reasoning would be arbitrary or capricious.

In the NOAA Memorandum, the authors correctly point out that the purpose of the Act is to facilitate adherence to the U.N. Moratorium.  AR 22.  A continuing cycle of identifications might not be the most desirable means of implementing or interpreting the statute, but neither is such an approach clearly at odds with the statute.[14]  The interpretation of the statute in the NOAA Memorandum may be a more efficient use of the agency's resources and had the Secretary adopted this reasoning through formal rulemaking it would likely be upheld if challenged.[15]

However, the Driftnet Act itself does not specify procedures after the certification of a nation under 16 U.S.C. § 1826b.  Accordingly, a certification need not be withdrawn to comport with the

---

[14]  The legislative history is silent on this issue.

[15]  In fact, the promulgation of regulations to fill the interstices of this statute would aid both Plaintiffs and Defendants.  Decisions of the sort implicated by the practices in question are more adequately addressed closer to the water.  A formal administrative process could resolve a great many issues more quickly and at less expense.  The need to litigate the existence of illegal driftnet fishing initially before this Court comes at a greater cost and is less efficient than an agency level proceeding.

statutory requirements. Under the statute the process begins anew if a nation resumes illegal large-scale driftnet fishing following a certification.[16] While these consequences may not be the strong response the Plaintiff desires, this is the most that can be required under the express terms of the statute.

> If Congress has directly spoken to the precise issue in question, if the intent of Congress is clear that is the end of the matter. . . . Furthermore, if a statute is silent or ambiguous with respect to the question at issue, our longstanding practice is to defer to the "executive department's construction of a statutory scheme it is entrusted to administer," . . . unless the legislative history of the enactment shows with sufficient clarity that the agency construction of the statute is contrary to the will of Congress.

*Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 233 (1986) (citations omitted).

Thus, the Secretary's decision not to withdraw the certification was not arbitrary, capricious or not in accordance with the Driftnet Act.

## VI. WHETHER THE SECRETARY OF COMMERCE HAS REASON TO BELIEVE ILLEGAL DRIFTNET FISHING IS OCCURRING

Plaintiffs request, in the alternative, that the Court order the Secretary of Commerce to find that there is reason to believe Italian nationals are conducting large-scale driftnet fishing beyond the exclusive economic zone of any nation. This Court, in *Humane Society of the United States v. Brown*, Slip Op. 96-55 (1996) (judgment order) ordered the Secretary of Commerce "to identify Italy as a nation for which there is reason to believe that its nationals or vessels are conducting large-scale

---

[16] Withdrawing the certification in this instance would have resulted in a continuance of the denial of entry of Italian driftnet vessels into the territorial waters of the United States and the mandate that fish imported into the United States contain a statement that they were not caught using driftnets.

driftnet fishing beyond the exclusive economic zone of any nation and [to] notify the President of the United States and the nation of Italy of this identification." *Id.* In accordance with the Court's interpretation of the Driftnet Act, and despite the existence of the Agreement, the Court finds that the allegations of large-scale driftnet fishing are sufficient, once again, to order the Secretary of Commerce to identify Italy under 16 U.S.C. § 1826a(b)(1)(B).

Defendants admitted at oral argument that there were nine confirmed sightings of Italian nationals or vessels driftnet fishing beyond the exclusive economic zone of any nation, yet argue that such evidence does not meet the reason to believe standard set forth in the Act.

This Court has decided that belief, not knowledge, is sufficient to satisfy the reason to believe standard found in the Driftnet Act. *See Humane Society II*, 920 F. Supp. at 191-92. Indeed, this Court rejected the Defendants' approach requiring concrete evidence of fishing occurring beyond the exclusive economic zone of any nation as well as "specific corroboration including the name, nationality, and registration information of the vessel . . .; the length of the nets deployed in the water . . .; the vessel position and the time and date on which the activity occurred." *Humane Society II*, 920 F. Supp. at 191. At oral argument, Defendants admitted that this Court had rejected, in *Humane II*, their argument that "reason to believe" is an exacting standard requiring significant detail. The Court rejects Defendants' continued strained reading of the Act and notes that mutual collateral estoppel governs this issue.

A. *Collateral Estoppel*

The application of collateral estoppel requires that the issue previously determined be identical, actually litigated and necessary to the end decision. *See Thomas v. GSA,* 794 F.2d 661, 664 (Fed. Cir. 1986); *see also American Permac, Inc. v. United States*, 16 CIT 672, 674-75, 800 F.

Supp. 952, 954-59 (1992); *Washington Int'l. Ins. v. United States*, 18 CIT 654, 657 (1994); *Union Camp Corp. v. United States*, 8 F. Supp. 2d 842, 847 (CIT 1998).[17] In question is the interpretation of language found at 16 U.S.C. § 1826a(b)(1)(B) imposing a reason to believe standard on the Secretary, in weighing the evidence that triggers identification to the President. The identical issue was before the Court in *Humane II*. *See Humane II*, 920 F. Supp. at 191. The other elements of collateral estoppel are also met, that the issue be actually litigated and necessary to the end decision. Its actual litigation is beyond doubt[18] as is that the resolution of the issue was necessary to the final decision. One test used to determine whether an issue was necessary, and thus precluded from re-litigation, is by positing whether review of the decision would have been available on appeal. *See* Restatement (Second) Judgments § 28 cmt. a (1982). Clearly, it would have been had Defendants chosen to appeal *Humane II*.[19]

Since this case involves mutual offensive collateral estoppel it falls within the discretion of

---

[17] Further, the parties must be represented by counsel, an element clearly satisfied here.

[18] "When an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated. . . . An issue may be submitted and determined on a motion for summary judgment . . ." Restatement (Second) Judgments § 27 cmt. d (1982).

[19] The Court is mindful of the Supreme Court's admonitions in *United States v. Mendoza*, 464 U.S. 154, 162 (1984), that nonmutual offensive collateral estoppel does not run against the government due to its unique status as a litigant. *See generally* Note, *Collateral Estoppel and Nonacquiescence: Precluding Government Relitigation in the Pursuit of Litigant Equality*, 99 HARV. L. REV. 847 (1986); David A. Hartquist et al., *Toward a Fuller Appreciation of Nonacquiescence, Collateral Estoppel, and Stare Decisis in the U.S. Court of International Trade*, 14 FORDHAM INT'L L.J. 112 (1990). When the government is a litigant, considerations beyond the merits of an individual determination often dictate whether to pursue an appeal. To estop the government from re-litigating an issue it lost in a different case against a different party would, in essence, force it to appeal every adverse decision against it. Additionally, the law of a circuit will often differ, thereby further justifying arguing the same position decided adversely in one circuit in another. But in a case involving the government against the same litigants the above concerns fall away. A decision on the value of appealing the decision already has been made and differences in the law of the circuit, similarly, do not apply in light of this Court's exclusive, nationwide jurisdiction over the subject matter.

the Court to apply. *See Park Lane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979). Since mutual defensive collateral estoppel runs against the government, *see United States v. Stauffer Chemical Co.*, 464 U.S. 165 (1984); *see also Montana v. United States*, 440 U.S. 147 (1979), there is no reason to make an exception for mutual offensive collateral estoppel. Defendants are not estopped in all respects from re-litigating whether the Secretary had reason to believe prohibited fishing was occurring, but they cannot argue that the Court should adopt a different legal standard for the reason to believe standard than that set forth in the Court's decision in *Humane II*. The Court, in *Humane II*, unequivocally rejected the Defendants' interpretation of the reason to believe standard as a matter of law.[20]

Defendants once again posit that an identification cannot be made on the basis of the information Plaintiffs have supplied, which includes reports of prohibited fishing without precise net measurements or vessel location or positive identification. While the Defendants are precluded from re-arguing what the Driftnet Act requires the Secretary to consider, Plaintiffs must adduce sufficient facts to demonstrate a reason to believe that illegal driftnet fishing is ongoing.

*B. Sightings*

1. 1996 Fishing Season

Plaintiffs offer a Greenpeace report as factual support for their contention that illegal driftnet fishing continued unabated following the Agreement with Italy. AR 59. The Greenpeace report contains numerous allegations of large-scale driftnet fishing. AR 59. The Greenpeace report ends

---

[20] Defendants' "approach contemplates not only actual knowledge of the forbidden activity, they claim to also require 'specific corroboration' and 'reliable, well documented reports' and 'confirmed, verified sightings'. . . . "[M]aintenance of the best possible foreign relations may commend such surety but the statute under review does not require it." *Humane II*, 920 F.Supp. at 191-92.

on July 30, 1996, just four days after the Agreement was finalized. AR 59. Additional sightings were made in the latter part of the summer, which led to an NMFS investigation. The NMFS investigator conducted interviews with the sources of the sightings and concluded that longline fishing, which is legal, was being conducted using drifting longline equipment. AR 85B. The Sebastiano Aciplanti, an Italian vessel, was found using driftnets believed to be illegal, but the net length was not able to be measured. AR 85B.

2. 1997 Fishing Season

Sightings came from a number of sources in 1997. The Italian government provided enforcement data showing 59 administrative violations, 33 administrative seizures and 98.5 kilometers of net seized for violations. AR 436 at 5. Including the information provided by Italian Customs Police the numbers, respectively, are 117, 91 and 239.1 km. *Pl's Stmnt of Mat'l Fact* ¶ 21. Defendants do not dispute the numbers.[21] The U.S. Navy also sighted several vessels suspected of being Italian and presumed to be engaging in illegal driftnet fishing. *See* AR 25-27. Again, Defendants admit these sightings but disclaim their relevance. Greenpeace reported twenty driftnet vessels in March and spotted driftnet vessels near the Balearic Islands in April. AR 182, 205. Finally, Plaintiffs conducted their own investigation of nine ports and found "dozens of Italian driftnet vessels with large-scale driftnets aboard." *Pl's Stmnt of Material Fact* at ¶ 26, AR 33. Defendants argue that Plaintiffs' findings are not relevant in deciding whether the Secretary has reason to believe under the Driftnet Act since the vessels were not on the high seas. The Court

---

[21] Defendants state that the numbers do not reflect numbers of vessels found to be on the high seas. *Def't Stmnt of Facts* ¶ 21. However, as discussed above, the reason to believe standard is not so exacting. A reasonable person would have to infer, based on prior conduct and current allegations that some of these vessels, equipped to conduct driftnet fishing, were going to fish in the high seas or had already.

disagrees. Under the reason to believe standard articulated in *Humane II*, the presence of such vessels can be one of the factors leading to belief, if not knowledge, that illegal fishing is occurring. *See Humane II*, 920 F. Supp. at 191-92.

3. 1998 Fishing Season

At oral argument Defendants admitted that nine violations were confirmed during the 1998 fishing season. The record indicates that seven of the nine vessels were charged with violations. AR 563 at 6.[22] Greenpeace provided a report to the Department of State containing numerous allegations of illegal driftnet fishing. AR 547. The Interagency Consultation group considered the report serious but adhered to the position that if the fishing was not on the high seas it would not be a violation of the Driftnet Act. AR 547.[23] As a result, the NMFS sent two investigators who winnowed the allegations to nine confirmed sightings of illegal driftnet use on the high seas. AR 555. The investigators ignored the other fifteen sightings either because the vessels were not fishing at the time or were not found in the high seas. AR 555. From June to July the U.S. Navy reported approximately twenty sightings of what appeared to be driftnet fishing off the coasts of Sicily and Malta. AR 557. The Interagency Consultation record indicates that a majority of the reports probably indicated longline fishing and not driftnet fishing. AR 557. Finally, only 419 vessels have signed onto the voluntary conversion program leaving 259 vessels not participating. *See* AR 558, 560.

---

[22] Although the Defendants argue that Italy's enforcement efforts merit consideration under the Driftnet Act, the Court considers the violations as evidence giving reason to believe that large-scale driftnet fishing by Italian nationals or vessels is occurring beyond the exclusive economic zone of any nation.

[23] These reports, the Interagency Consultation procedural guidelines and meeting records were provided to the Secretary in an information memorandum on June 11, 1998. AR 551.

*C. The Secretary's 1998 Decision*

On October 21, 1998, the Secretary adopted a decision memorandum prepared for him on the desirability of revisiting whether there was reason to believe large-scale driftnet fishing by Italian nationals or vessels was occurring. AR 563. Defendants argue that the actions and positions of the Interagency Consultation group cannot be considered by the Court in arriving at its decision of whether the evidence on the record, as a matter of law, gives the Secretary reason to believe illegal driftnet fishing is occurring. The Court agrees that it must look instead to the reasoning employed by the ultimate decision maker, here the Secretary, which is found in the decision memorandum. Although the only documents on the record explaining the Secretary's interpretation of the Driftnet Act consist of the January 7, 1997, certification to Congress and the President and the October 21, 1998 decision memorandum, the Court is confident that these documents, especially the latter, provide it with sufficient insight to judge whether the Secretary acted in accord with the statute.

Contained in the decision memorandum were three recommendations upon which the decision not to identify Italy a second time, as well as the decision to support Secretary Kantor's 1997 certification was based: the NMFS June-July investigation; Italy's increased enforcement efforts; and the 1993 Presidential Review Directive on Oceans, Fisheries, and Fresh Water Resources. The Court reviews these factors to determine if the Secretary's decision was arbitrary, capricious or not in accordance with law on the basis of the record before him. Although the Court held earlier in this opinion it was not arbitrary, capricious or not in accordance with the Driftnet Act for the Secretary to uphold the January 7, 1997 certification, it was most certainly arbitrary, capricious and not in accordance with law for him to fail to identify Italy a second time on the evidence on the record before him and the Court so holds.

The evidence undisputably shows that "'a small percentage of Italian flag fishing vessels are still engaged in illegal high seas large-scale driftnet fishing in the Mediterranean Sea.'" AR 563 at 6. In fact, this was the conclusion contained in the report submitted by the NMFS and was one of the bases upon which the Secretary relied. Although the Court does not attempt to set a numeric value for what constitutes reason to believe, certainly in this case the nine confirmed sightings combined with the numerous allegations make the Secretary's refusal to identify Italy a second time arbitrary, capricious and not in accordance with the Driftnet Act.

The Secretary's decision also relies on the increased enforcement efforts of Italy. However, the express language of the statute is not concerned with whether the foreign government acts at all, rather the sole focus of the statute is whether driftnet fishing is ongoing. In a cable describing meetings between U.S. and Italian officials, the U.S. position was that "[i]n order to reinforce the defense's [Defendants here] position, . . . the GOT [*sic*] [Government of Italy] [is urged] to investigate all the driftnet vessel sightings, including those by Greenpeace." AR 558. Furthermore, these meetings acknowledge that driftnet fishing in violation of the Driftnet Act is ongoing. Whether Italy is acting to end it is irrelevant to the Secretary's having to identify Italy to the President. Once the nation is identified the President has the discretion to decide whether the nation is acting to end driftnet fishing through the consultation process. *See supra* Part III.

Finally, the Secretary rests his decision not to identify Italy a second time on the 1993 Presidential Review Directive. The relevant portion of the review directive states, "An illegal fishing operation that reflects a violation of government policy and which is resolved quickly and cooperatively with the U.S. should not trigger sanctions." Presidential Review Directive 12 (May 5, 1993). In the conduct of foreign affairs the President is afforded a considerable amount of

deference due to his status as the "sole organ of the federal government in the field of international relations." *Humane II*, 920 F. Supp. at 191 (citing United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320 (1936)). "On the other hand, when that power emanates, as herein, from an act of Congress, it is appropriate to invoke the judicial duty to say what the law is." *Humane II*, 920 F. Supp. at 191. Here, the Secretary attempts to rest his decision not to identify Italy on an interpretation by the President of the Driftnet Act. But the Secretary confuses imposing sanctions with identifying a nation. The President's view on what triggers sanctions is within the grant of discretion Congress provided him in the Driftnet Act. Whether to impose sanctions is a question that is not asked until consultations have begun and the President determines if they are satisfactorily concluded. Unlike the President, the Secretary is not afforded discretion. *See Humane I*, 901 F. Supp. at 350; *Humane II*, 920 F. Supp. at 191. It was in error for the Secretary to rely on the Presidential Review Directive discussing the imposition of sanctions in his decision not to identify Italy. The statute directs the Secretary to identify a nation whenever there is "reason to believe that the nationals or vessels of any nation are conducting large-scale driftnet fishing beyond the exclusive economic zone of any nation . . . ." 16 U.S.C. § 1826a(b)(1)(B). The Presidential Review Directive is simply not relevant to this determination.

Based upon all of the factors relied on by the Secretary, the Court must find that he acted arbitrarily, capriciously and not in accordance with law. One of the very bases of the decision not to identify Italy a second time contained a confirmation of nine vessels engaging in large-scale driftnet fishing. The Secretary's position is that such evidence is insufficient under the Driftnet Act to identify a nation. But coupled with the numerous additional allegations of driftnet fishing, which must be considered under the reason to believe standard set forth in the statute and as interpreted by

this Court in *Humane II*, the Secretary's continued failure to identify Italy is arbitrary, capricious and not in accordance with law.

Defendants argue that even if the Court finds the Secretary's actions to be arbitrary, capricious or not in accordance with the Driftnet Act, the proper remedy is remand to the agency. Defendants rely on 28 U.S.C. § 2643(b), which provides:

> If the Court of International Trade is unable to determine the correct decision on the basis of the evidence presented in any civil action, the court may order a retrial or rehearing for all purposes, or may order such further administrative or adjudicative procedures as the court considers necessary to enable it to reach the correct decision.

The statute, however, provides for remand if the Court determines it cannot reach the correct decision on the evidence before it. In this case, the Court does not find it necessary to remand to the agency for further proceedings because the correct decision is apparent from the evidence in the record which was before the agency. Moreover, it is altogether fitting and appropriate that the Court order the Secretary to identify Italy under the Driftnet Act. The Court in *Humane II* clearly established the legal standard for what constitutes reason to believe under 16 U.S.C. § 1826a(b)(1)(B). The Secretary acted contrary to the law by requiring precise net measurements and vessel location, positive vessel identification, that the sighting occur on the high seas and that the government's enforcement efforts be considered as mitigating factors. The evidence on the record before the Secretary and now before the Court gives reason to believe large-scale driftnet fishing is being conducted by Italian nationals and vessels. Therefore, the Court finds it appropriate to order the Secretary to identify Italy in accordance with the Driftnet Act.

## VII.  CONCLUSION

For the reasons discussed herein, the Court rules that the Driftnet Act does not impose a ministerial duty on the President.  Additionally, the Court finds that the Secretary's January 7, 1997, certification was not arbitrary, capricious or an abuse of discretion.  Further, since the Driftnet Act contains no requirement for the withdrawal of a certification once it is made, the Secretary has not violated the APA by refusing to act.  Finally, there being ample evidence that the Secretary of Commerce had reason to believe that large-scale driftnet fishing continues on the high seas by Italian nationals or vessels, the Secretary's refusal to identify Italy a second time is arbitrary, capricious and not in accordance with the Driftnet Act.  Judgment will be entered accordingly.


Dated: _____                    _____
     New York, NY                              Judith M. Barzilay
                                               Judge